# Illinois Official Reports

## Supreme Court

---

### *People v. Nere*, 2018 IL 122566

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JENNIFER N. NERE, Appellant |
| Docket No. | 122566 |
| Filed | September 20, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court of appeal from the Circuit Court of Du Page County, the Hon. Daniel P. Guerin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David P. Gaughan and Timothy Moran, both of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Lindsay Beyer Payne, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. |
| | Chief Justice Karmeier and Justices Kilbride, Garman, Burke, Theis, and Neville concurred in the judgment and opinion. |

¶ 1 A Du Page County jury convicted defendant, Jennifer N. Nere, of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2012)). Defendant appealed, arguing, *inter alia*, that (1) the trial court erred in refusing her proposed jury instructions on causation and (2) she was not proved guilty beyond a reasonable doubt. The appellate court affirmed her conviction and sentence. 2017 IL App (2d) 141143. We allowed defendant's petition for leave to appeal, and we now affirm the appellate court.

¶ 2                                  BACKGROUND

¶ 3 A complete statement of facts, including a summary of all of the testimony, may be found in the appellate court opinion. *Id.* ¶¶ 3-52. We summarize here only those facts necessary to an understanding of our decision.

¶ 4 On June 27, 2012, Augustina Taylor died in the bathroom of her mother's apartment in Wheaton. Taylor and other family members had gathered there to celebrate Taylor's release from prison the previous day. Taylor's girlfriend, Leslie Walker, joined the party sometime between 1 and 3 p.m. At around 10:30 p.m., Taylor called defendant to arrange a ride home for Walker. When defendant arrived, Taylor and Walker went down to defendant's car to meet her. According to defendant's own statements, defendant gave heroin, crack cocaine, a syringe, and a crack pipe to Taylor.[1] The pipe and syringe were wrapped in a dirty sock that had blood on it.

¶ 5 Taylor then went back into the apartment, told her children that she was going to take a shower, and told her nephew that he needed to get out of the bathroom. Taylor went into the bathroom and, approximately 15 minutes later, turned on the shower. Walker called the apartment while Taylor was in the bathroom. Taylor's son, Joshua, initially hung up on Walker, but after she called back repeatedly, he eventually agreed to speak her. Based on what Walker told him, Joshua alerted his grandmother and other family members, and several of them began trying to enter the locked bathroom. They eventually removed the doorknob but still could not open the door. Joshua called 911.

¶ 6 Officers arrived and forced the door open. Taylor was unresponsive. The officers carried Taylor to the living room and performed CPR. Paramedics arrived a few minutes later and transported Taylor to the hospital, where she was pronounced dead. The officers collected from the bathroom a bloodstained sock, a glass pipe, a small plastic bag, cigarettes, a lighter, a drug-cooking spoon, a syringe, and two foil bindles containing heroin residue. A DNA analysis of the blood on the sock came back as a match for defendant.

¶ 7 The forensic pathologist who performed Taylor's autopsy, Dr. Jeff Harkey, testified that Taylor died of heroin and cocaine intoxication due to intravenous drug use. Harkey found fresh needle puncture wounds on Taylor's arm. Harkey testified that three opiates were found in Taylor's blood—morphine, codeine, and 6-MAM. These opiates are associated with heroin use. The importance of 6-MAM is that it comes only from heroin. If a person takes pharmacological morphine, it would not cause codeine and 6-MAM to appear in the blood.

_____

[1]Although defendant acknowledged delivering both cocaine and heroin to Taylor, the State charged drug-induced homicide solely arising from the delivery of heroin.

When 6-MAM and morphine are found in the blood, the conclusion is usually that they both came from ingesting heroin. If enough time has passed, only morphine will appear in the blood. The significance of 6-MAM is that it shows recent use of heroin.

¶ 8 Harkey testified that the amount of morphine in Taylor's blood was "way beyond" what someone would take medically and was at an amount that is associated with heroin fatalities. According to Harkey, there is no "safe" amount of heroin to ingest, and a person can die from taking their usual amount. The amount of heroin ingested by Taylor could have been fatal by itself. On cross-examination, Harkey acknowledged that high levels of morphine in the blood could be accumulative and indicate heroin use over several days.

¶ 9 Dr. Harkey testified that cocaine metabolites were also found in Taylor's blood and urine. The principal one was benzoylecgonine. Harkey testified that the small amount of the metabolite in Taylor's blood could have indicated either that she took a large amount of cocaine at an earlier time or that she had taken a smaller amount closer to the time of death. Thus, he could not offer an opinion as to how recently Taylor had used cocaine. On cross-examination, he was asked whether cocaine use alone could cause death:

"Q. Now, isn't it true, possible now, possible, that any level—any—any amount of cocaine could cause cardiac arrhythmia which could lead to fatal heart failure; isn't that true?

A. Yes.

\*\*\*

Q. Okay. Well your testimony on direct was that it's possible that heroin alone could cause a death, correct?

A. Yes.

Q. And your testimony is also that it's possible that cocaine could cause a death; isn't that right?

A. Yes."

¶ 10 On redirect examination, Harkey reiterated that the presence of 6-MAM in the blood indicated recent use of heroin, and on recross-examination he explained that "the last dose would be the one that has 6-MAM still found in it. In accumulative doses, things that are taken the day before, you're not going to find the 6-MAM."

¶ 11 The jury heard conflicting testimony over whether Taylor had consumed drugs before receiving the cocaine and heroin from defendant and also over whether Taylor and Walker were ever alone together at the party. Walker testified that on June 26, 2012, the day Taylor was released from prison, Walker picked her up at the Greyhound station in Chicago. Taylor wanted to get high, so Walker took her back to Walker's house in Summit. Taylor went next door and bought heroin at a drug house. Taylor returned to Walker's house and injected the heroin into a vein. Taylor also "smoked a little crack," following which Walker took her home. The next day, defendant dropped Walker off at Taylor's mother's house at around 2 or 3 p.m. Walker went into the house with Taylor and fell asleep. Walker remembered Taylor snorting heroin in the bathroom that afternoon. Walker did not remember anything else until Taylor woke her up when defendant arrived.

¶ 12 On cross-examination, Walker was impeached with an interview that she gave to the police on December 5. On that date, Walker told the police that, when she picked up Taylor upon

Taylor's release from the penitentiary, they went to Walker's sister's house in LaGrange. They did not use drugs on that date. Walker told the police that Taylor had wanted drugs but that Walker had refused to give her any heroin. Later that evening, Walker dropped Taylor off at her mother's home in Wheaton, and Walker did not see her again until defendant dropped her off there the next day at around 2 or 3 p.m. Walker acknowledged telling the police that she and Taylor did not do drugs that afternoon, but she claimed that she did so because she had promised Taylor that she would not tell her family that she was using drugs again. Walker agreed that she had told the police that she was "100% sure" that Taylor had not used drugs that day.

¶ 13    Members of Taylor's family testified that Taylor arrived at her mother's house on the night she was released from prison and that she was behaving normally. When Walker arrived at the party the next afternoon, Taylor's family members observed Taylor and Walker walking on a path around the pool, and they were visible to the partygoers as they did so. After the partygoers moved inside, Taylor and Walker sat in the living room together, and Taylor braided Walker's hair. Taylor and Walker were never alone during this time, and Taylor's family members testified that she was acting normally until the time she escorted Walker out to defendant's car.

¶ 14    The defense brought out on cross-examination of Wheaton police officer Dan Salzmann that two of Taylor's family members had told Salzmann that Taylor and Walker had broken off from the rest of the party and spent time alone together. Salzmann was also asked on cross-examination if he remembered defendant saying that Taylor had heroin left over from the previous day. Salzmann said he did not remember that. He then stated that defendant had said that she saw Taylor with a bag of heroin the day before, that Taylor had taken some of it, and that there was some left over. Salzmann said that he would "presume" that defendant still had some heroin left after Taylor saw her use some of it the day before.

¶ 15    At the jury instructions conference, a dispute arose over how the jury should be instructed on causation. The relevant portion of the drug-induced homicide statute provided:

> "A person who violates Section 401 of the Illinois Controlled Substances Act or Section 55 of the Methamphetamine Control and Community Protection Act by unlawfully delivering a controlled substance to another, and any person's death is caused by the injection, inhalation, absorption, or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide." 720 ILCS 5/9-3.3(a) (West 2012).

The court instructed the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 7.28 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 7.28):

> "That to sustain the charge of Drug Induced Homicide, the State must prove the following propositions:
>
> *First Proposition*: That the defendant knowingly delivered to another a substance containing heroin, a controlled substance; and
>
> *Second Proposition*: That any person injected, inhaled or ingested any amount of the controlled substance; and

*Third Proposition*: That Augustina Taylor's death was caused by[2] that injection, inhalation or ingestion.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 16 The trial court further gave Illinois Pattern Jury Instructions, Criminal, No. 7.15 (4th ed. Supp. 2011) (hereinafter IPI Criminal 4th No. 7.15 (Supp. 2011)), which is titled "Causation in Homicide Cases Excluding Felony Murder." Thus, the jury was instructed that

"[i]n order for you to find that the acts of the defendant caused the death of Augustina Taylor the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

Defendant objected to the use of this instruction on two grounds. First, she argued that it was potentially misleading in that it referred to defendant's "acts" instead of her delivery of heroin. Defendant contended that this could mislead the jury into considering her delivery of cocaine to Taylor, even though the State had charged drug-induced homicide solely arising out of her delivery of heroin. Second, she argued that by using "contributing cause" language, the instruction ran afoul of *Burrage v. United States*, 571 U.S. ___, 134 S. Ct. 881 (2014). In *Burrage*, the Supreme Court considered the meaning of the phrase "results from" in section 841(a)(1), (b)(1)(A)-(C) of the federal Controlled Substances Act (21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012)), which imposes a 20-year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when "death or serious bodily injury results from the use of such substance." The jury instruction in that case required the government to prove that the defendant's distribution of the controlled substance was a contributing cause of the victim's death. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 886. The Supreme Court held that the ordinary understanding of the phrase "results from" is "but-for" causality. *Id.* at ___, 134 S. Ct. at 887-91. In other words, the government must show that " ' "the harm would not have occurred" in the absence of—that is, but for—the defendant's conduct.' " *Id.* at ___, 134 S. Ct. at 887-88 (quoting *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. ___, ___ 133 S. Ct. 2517, 2525 (2013), quoting Restatement of Torts § 431 Comment a (1934)). The Supreme Court acknowledged that some jurisdictions consider a cause-in-fact to be

---

[2]The pattern instruction uses the phrase "That _____ died *as a result of* that [(injection) (inhalation) (ingestion)]." (Emphasis added.) IPI Criminal 4th No. 7.28. This wording reflects the previous version of the drug-induced homicide statute, which provided that a person commits drug-induced homicide when he delivers a controlled substance to another and "any person dies as a result of the injection, inhalation or ingestion of any amount of that controlled substance." 720 ILCS 5/9-3.3(a) (West 2004). The legislature modified the statute, effective in 2006, to change the language "any person dies as a result of" to "any person's death is caused by." 720 ILCS 5/9-3.3(a) (West 2006). The parties and the trial court agreed that the pattern instruction should be modified to reflect this change in the wording of the statute.

something that was a "substantial" or "contributing" factor in producing a given result. *Id.* at ___, 134 S. Ct. at 890. However, the Court noted that Congress had not written the statute in contributing cause language but had instead used the phrase "results from," which language is commonly understood to import "but-for" causality. *Id.* at ___, 134 S. Ct. at 891.

¶ 17    In light of *Burrage*, defendant proposed modifying the causation instruction to read:

"In order for you to find that the acts of the defendant caused the death of Augustina Taylor, the State must prove beyond a reasonable doubt that the defendant's act of delivering heroin and Augustina Taylor injecting that heroin was the proximate cause of her death and that her death did not result from a cause unconnected with Augustina Taylor's injection of the heroin defendant delivered. However, it is not necessary that you find the act of delivering heroin was the sole and immediate cause of death."

Defendant further proposed that the jury be instructed as follows:

"Proximate cause is a cause that directly produces an event and without which the event would not have occurred. Proximate cause is established if Augustina Taylor's death was caused by the heroin that defendant delivered to her."

¶ 18    With respect to defendant's first objection, the State argued that the other instructions in the case made it clear that only defendant's delivery of heroin was at issue. The court stated that it could see counsel's point and had wrestled with the issue itself, but ultimately decided not to modify the causation instruction to read "defendant's act of delivering heroin." The court explained that the appellate court had approved the use of IPI Criminal 4th No. 7.15 (Supp. 2011) for use in drug-induced homicide cases in *People v. Kidd*, 2013 IL App (2d) 120088, and the court was bound by that decision. The court noted that the question of whether the jury should be instructed on proximate cause concepts was considered in *Kidd* and that the *Kidd* court had concluded that IPI Criminal 4th No. 7.15 (Supp. 2011) correctly stated the law and that no further instruction on proximate cause was necessary. With respect to defendant's second objection, the court had earlier explained in denying defendant's motion for a directed verdict that it believed that *Burrage* simply resolved a question of federal statutory interpretation and was not binding on state courts.

¶ 19    The jury convicted defendant of drug-induced homicide, and the trial court sentenced her to nine years' imprisonment. Defendant appealed, and the Appellate Court, Second District, affirmed. 2017 IL App (2d) 141143. Relevant to the issues before us today, the court held that the trial court did not abuse its discretion in using the IPI on causation and that the evidence was sufficient to convict defendant of drug-induced homicide. Although acknowledging that *Burrage* was not controlling because it involved the construction of a federal statute, the appellate court stated that it agreed with defendant that Illinois courts should follow *Burrage*. *Id.* ¶¶ 77-78. The court explained that it agreed with *Burrage* that allowing juries to "find causation based on an unspecified 'contribution' to the likelihood of death raises grave due-process concerns." *Id.* ¶ 78. The court stated that "[t]o allow a person to be convicted of 'homicide' because she *might* have caused the victim's death violates the traditional understanding of causality and the rule of lenity." (Emphasis in original.) *Id.* The court then explained that, both in the tort and criminal cases, "contributing cause" is not well defined, and there is no consensus on what it means. The court found that both Illinois and out-of-state authority is mixed on whether or not "but-for" causation is incorporated in the concept of contributing causation. *Id.* ¶¶ 68-97.

¶ 20   Although the court agreed with *Burrage* that "but-for" causation is required, it ultimately could not find that the trial court abused its discretion in using the IPI on causation and rejecting defendant's proposed instructions. The court held this for several reasons. First, defendant's proposed instructions did not accurately set forth the law of causation. Defendant's instructions incorporated the concept of "but-for" causation but did not explain the concept of "multiple-independent causation," which is a well-recognized exception to the rule of "but-for" causation. *Id.* ¶¶ 74, 100. The court did not believe this error was crucial under the circumstances because the evidence would not have supported a finding that the heroin alone caused defendant's death. *Id.* ¶ 75. The court believed that a more serious problem with defendant's proposed instructions was that they "needlessly repeated the concept of proximate cause and potentially confused causation-in-fact with foreseeability." *Id.* ¶ 100. The court noted that it had rejected proximate cause instructions on this basis in *Kidd*. *Id.* Second, the appellate court acknowledged that IPI Criminal 4th No. 7.15 (Supp. 2011) contains a correct statement of Illinois law and directly tracks language repeatedly used in Illinois cases. *Id.* ¶ 101. The court opined that the language of the IPI is ambiguous and probably difficult for jurors to apply, but it could not find that the trial court abused its discretion in choosing the IPI over defendant's proffered instructions: "Nonetheless, it is difficult to fault the trial court for giving an instruction that was based on Illinois law instead of a set of instructions that deviated from it and of which we had already disapproved in part." *Id.* However, the court stated that either the legislature or the courts should clarify that "but-for" causation is required to convict someone of a criminal offense. The court cited the Pennsylvania causation statute (18 Pa. Cons. Stat. Ann. § 303(a) (West 2011)) as an example of a state legislature requiring "but-for" causation and *State v. Christman*, 249 P.30 680 (Wash. Ct. App. 2011), as an example of a court adopting a rule that "but-for" causation is required to establish cause-in-fact.[3] 2017 IL App (2d) 141143, ¶ 107 n.3.

¶ 21   The court next considered defendant's argument that the trial court erred in failing to modify IPI Criminal 4th No. 7.15 (Supp. 2011), which referred to "defendant's acts," "the acts of the defendant," and a "cause unconnected with the defendant." Defendant contended that, as she had also delivered cocaine to defendant and the State had not charged that conduct, there was a risk that the jury would consider defendant's uncharged conduct in finding her guilty. Defendant contended that the instruction should have referred to her "act of delivering heroin" and a cause "unconnected to her delivery of heroin." The appellate court agreed with

---

[3]The appellate court's reliance on *Christman* for this proposition is problematic. The *Christman* court quite clearly stated that

> "[t]here are several tests for factual causation, the most common of which is the 'but for' test, although the 'substantial factor' test applies in some circumstances. *Id.* One instance in which the substantial factor test applies is where multiple causes could have produced the identical harm, thus making it impossible to prove the 'but for' test. *The 'substantial factor' test is generally applied in multiple causation cases. Id.* at 613, 953 P.2d 470 (quoting *Allison v. Housing Auth.*, 118 Wash.2d 79, 94, 821 P.2d 34 (1991)). *Under the substantial factor test, all parties whose actions contributed to the outcome are held liable*." (Emphases added.) *Christman*, 249 P.3d at 687.

The Supreme Court in *Burrage* even listed *Christman* as an example of a state court adopting a "substantial" or "contributing" factor requirement instead of "but-for" causation. See *Burrage*, 571 U.S. at ___, 134 S. Ct. at 890.

defendant's argument and stated that the instruction "might well benefit from amendment in this regard as well." 2017 IL App (2d) 141143, ¶ 110. However, the court ultimately found the error harmless, noting that the question is "whether the instructions, read as a whole, fully and fairly stated the applicable law." *Id.* ¶ 111. Other instructions made clear that the focus was solely on defendant's alleged delivery of heroin. The court thus held that any error was harmless. *Id.* ¶ 109.

¶ 22    Finally, the court considered whether the evidence was sufficient to support defendant's conviction. The court held that a rational trier of fact could have found the elements of drug-induced homicide beyond a reasonable doubt. *Id.* ¶¶ 122-27. The court explained that, assuming the State was required to prove "but-for" causation, it did so. The court relied on Harkey's testimony that the cause of death was heroin and cocaine intoxication. The court explained that the logical inference from Harkey's testimony is that the heroin and cocaine together caused Taylor's death and that the evidence did not require the jury to speculate that only the cocaine was responsible. *Id.* ¶ 123. Defendant also relied on evidence that, on the day of Taylor's death, Taylor might have had heroin left over from the day before. The court noted that the testimony defendant used to establish this possibility was suspect. *Id.* ¶¶ 124-25. Moreover, even if defendant did have heroin left over from the previous day, the jury could reasonably infer that it was the heroin defendant delivered that caused her death. The jury could infer that Taylor's request for heroin on the day of her death meant that she was out of heroin at the time. *Id.* ¶ 126.

¶ 23    We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2017).

¶ 24                                    ANALYSIS

¶ 25    We first need to clarify what issues are properly before the court. Defendant elected to stand on her petition for leave to appeal as her brief to this court. See Ill. S. Ct. R. 315(h) (eff. July 1, 2017). There are three arguments in the brief that are sufficiently developed for our consideration: (1) that the appellate court erred in finding no abuse of discretion in giving the causation instruction after concluding that the instruction did not comply with the principles set forth in *Burrage*, (2) that the trial court failed to modify the causation instruction to clarify that only defendant's act of delivering heroin could be considered, and (3) that the State failed to prove defendant guilty of drug-induced homicide beyond a reasonable doubt. Defendant references the other issues she raised before the appellate court in a single sentence: "The trial [c]ourt also erred in not giving defense instructions 1 thru 7." This argument is forfeited by defendant's failure to comply with Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2017). See *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) ("An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule."). Thus, we will confine our analysis to the three issues set forth above.

¶ 26                            I. Causation Instruction
¶ 27                            A. *Contributing Cause*
¶ 28                       1. The Contributing Cause Rule in Illinois
¶ 29    We first consider whether the trial court erred in using IPI Criminal 4th No. 7.15 (Supp. 2011) to define causation rather than instructing the jury according to the principles set forth by the Supreme Court in *Burrage*. " 'The sole function of instructions is to convey to the minds of

the jury the correct principles of law applicable to the evidence submitted to it in order that, having determined the final state of facts from the evidence, the jury may, by the application of proper legal principles, arrive at a correct conclusion according to the law and the evidence.' " *People v. Ramey*, 151 Ill. 2d 498, 535 (1992) (quoting *People v. Gambony*, 402 Ill. 74, 81-82 (1948)). In general, whether the trial court erred in refusing a particular jury instruction is reviewed under an abuse of discretion standard. *People v. McDonald*, 2016 IL 118882, ¶ 69. Whether a particular jury instruction accurately conveyed to the jury the law applicable to the case, however, is an issue that we review *de novo*. *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 30     The appellate court viewed the principal issue solely as a discretionary one. For the following reason, we believe that *de novo* review is appropriate. Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) provides that, when there is an applicable IPI instruction, the trial court is *required* to use it unless the trial court determines that the IPI instruction does not accurately state the law. Here, the pattern instructions contain an instruction specifically for "Causation in Homicide Cases Excluding Felony Murder." See IPI Criminal 4th No 7.15 (Supp. 2011). Thus, the trial court was required to use this instruction rather than defendant's proposed causation instructions if it contained a correct statement of the law. The principal question we must address, therefore, is whether IPI Criminal 4th No. 7.15 (Supp. 2011) properly sets forth the law of causation applicable to defendant's case. We review this question *de novo*. See *Pierce*, 226 Ill. 2d at 475.

¶ 31     There is no question that IPI Criminal 4th No. 7.15 (Supp. 2011) is a correct statement of Illinois causation principles. Generally, when a crime requires both an act by defendant and a specified result of that act, the defendant's act must be both the "cause in fact" of the result and the "proximate" or "legal" cause of the result. 1 Wayne R. LaFave, Substantive Criminal Law § 6.4, at 628 (3d ed. 2018). The first requirement means that the defendant's act must be an actual cause of the result. *Id.* § 6.4(a), at 630. The second requirement means that the result that actually occurs "must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result."[4] *Id.* § 6.4(a), at 630-31.

---

[4] Barring unusual circumstances, it would seem that only cause-in-fact will be at issue in drug-induced homicide cases. The statute already spells out what act a defendant must commit, what harm must occur, and how the harm must occur, and the only mental state requirement is the defendant's knowing delivery of a controlled substance. See *People v. Faircloth*, 234 Ill. App. 3d 386, 391 (1992) ("[t]he defendant just needs to make a knowing delivery of a controlled substance, and if any person then dies as a result of taking that substance, the defendant is responsible for that person's death"). Moreover, the federal courts in construing the analogous portion of the federal Controlled Substances Act (21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012)) have concluded both before and after *Burrage* that there is no foreseeability requirement. See *United States v. Harden*, 893 F.3d 434, 447-48 (7th Cir. 2018); *United States v. Burkholder*, 816 F.3d 607, 617-20 (10th Cir. 2016); *United States v. Alvarado*, 816 F.3d 242, 249 (4th Cir. 2016); *United States v. Webb*, 655 F.3d 1238, 1250-55 (11th Cir. 2011); *United States v. De La Cruz*, 514 F.3d 121, 137 (1st Cir. 2008); *United States v. Houston*, 406 F.3d 1121, 1124-25 (9th Cir. 2005); *United States v. Carbajal*, 290 F.3d 277, 284-85 (5th Cir. 2002); *United States v. McIntosh*, 236 F.3d 968, 972 (8th Cir. 2001), *abrogated on other grounds by Burrage*,

¶ 32    The easiest way to establish cause-in-fact or "actual" cause is through the "but-for" test. This is established by showing that "but for the conduct the result would not have occurred." *Id.* § 6.4, at 628. As the Supreme Court noted in *Burrage*, however, some jurisdictions apply either a "substantial factor" or "contributing cause" test to determine cause-in-fact. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 890. Illinois has consistently stated causation requirements in terms of contributing causation. See, *e.g.*, *People v. Brown*, 169 Ill. 2d 132, 152 (1996); *People v. Gacho*, 122 Ill. 2d 221, 244 (1988); *People v. Brackett*, 117 Ill. 2d 170, 176 (1987); *People v. Love*, 71 Ill. 2d 74, 81 (1978); *Cunningham v. People*, 195 Ill. 550, 572-73 (1902). IPI Criminal 4th No. 7.15 (Supp. 2011) spells out causation principles the way they have been consistently defined by the Illinois courts. Again, the instruction provides:

> "In order for you to find that the acts of the defendant caused the death of ___, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death."

Each of these propositions is taken directly from this court's case law. In *Brown*, 169 Ill. 2d at 152, this court stated:

> "In order to prove a defendant guilty of murder (other than by accountability), the prosecution must prove, *inter alia*, that an act of the defendant contributed to the victim's death. (*People v. Brackett* (1987), 117 Ill. 2d 170, 177.) The defendant's act, however, need not be the sole or immediate cause of death; rather, it is sufficient if the defendant's act contributed to cause the death."

In *Brackett*, 117 Ill. 2d at 176, this court stated:

> "The courts in Illinois have repeatedly held that an intervening cause completely unrelated to the acts of the defendant does relieve a defendant of criminal liability. [Citations.] The converse of this is also true: when criminal acts of the defendant have contributed to a person's death, the defendant may be found guilty of murder. [Citations.] It is not the law in this State that the defendant's acts must be the sole and immediate cause of death."

Thus, IPI Criminal 4th No. 7.15 (Supp. 2011) is a correct statement of Illinois causation principles.

¶ 33    In most cases, even though cause-in-fact requirements are stated in terms of "contributing cause," the defendant's act will be a "but-for" cause of the victim's death. It is clear, nevertheless, that in Illinois the concept of "contributing causation" is broader than "but-for" causation. In *Brown*, the defendant was convicted of murder and sentenced to death. *Brown*, 169 Ill. 2d at 138. The evidence showed that the victim had died after being shot with two different weapons, a 9-millimeter handgun and a .45-caliber Uzi. *Id.* at 139. The victim had received a total of three gunshot wounds, and one 9-millimeter bullet and one .45-caliber bullet were retrieved from his body. *Id.* The wounds were in his back, buttocks, and leg. *Id.* The pathologist testified that the gunshot wounds were the cause of the victim's death, but he could

---

571 U.S. ___, 134 S. Ct. 881; *United States v. Robinson*, 167 F.3d 824, 832 (3d Cir. 1999); *United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994).

*not* say which of the three wounds had caused the death. He stated that " 'any three [*sic*] of them' " could have killed the victim.[5] *Id.*

¶ 34    The defendant challenged the sufficiency of the evidence supporting his conviction, arguing specifically that the State had failed to prove the causation element of murder. *Id.* at 151. The defendant contended that another man, Dwayne Macklin, had fired the Uzi and that the State had the burden of proving that the victim's death did not result from the wound or wounds caused by the Uzi. *Id.* This court noted that the defendant was apparently conceding that he had fired the 9-millimeter weapon. *Id.* at 151 n.1. This court rejected the defendant's sufficiency argument. First, this court explained that the evidence was sufficient for the trial court to find that it was the defendant who had fired the Uzi and therefore contributed to the victim's death in that manner. *Id.* at 152-53. This court next stated the following:

> "Further, even if the defendant's assertion, that it was Macklin and not the defendant who fired the Uzi, is accurate, we would still find the evidence sufficient to prove the causation element of the prosecution's case. As noted, the defendant's act need only contribute to the victim's death to prove the defendant guilty of murder. (*Brackett*, 117 Ill. 2d at 176.) The evidence demonstrated that Sims was wounded by shots fired from both a .45-caliber weapon and a 9-millimeter weapon. The defendant does not dispute that he fired one of the two guns which shot Sims. The pathologist testified that Sims died as a result of 'any three of [the wounds].' Thus, the evidence supported the inference that all three of the gunshots *contributed* to Sims' death. There was certainly no evidence to the effect that any of the three shots did *not* contribute to Sims' death. Thus, regardless of whether the defendant fired the Uzi or the 9-millimeter weapon, the evidence supported the conclusion that the defendant's act contributed to Sims' death." (Emphases in original.) *Id.* at 153.

Clearly, the prosecution in *Brown* had not established that the defendant's conduct was a "but-for" cause of the victim's death. The pathologist stated that he could *not* say which of the wounds had caused the victim's death and that it could have been any of them. Yet this court still held that the evidence was sufficient to establish the causation element of murder. *Id.*

¶ 35    Similarly, the appellate court has not always required strict "but-for" causation. In *People v. Martinez*, 348 Ill. App. 3d 521 (2004), one of the cases cited in the "Committee Note" to IPI Criminal 4th No. 7.15 (Supp. 2011), the victim was beaten to death by the defendant and several other men. The defendant argued that the trial court had "rejected premising defendant's guilt on an accountability theory." *Id.* at 530. The defendant contended that he could not be convicted of first degree murder as a *principal* because there was no evidence that he alone caused the victim's death or that he had struck the victim with sufficient force to have alone caused his death. *Id.* The appellate court rejected the argument. The court disagreed with the defendant that the trial court had rejected his guilt based on an accountability theory. Rather, "the court merely recognized that the evidence was sufficient to prove him guilty as a principal." *Id.* at 530-31. The appellate court agreed with the trial court that there was sufficient evidence to convict the defendant as a principal. The court cited the "contributing cause" rule from *Brown* and explained that a defendant's act need not be the sole or immediate

---

[5]It seems clear that the pathologist's statement means "any one of the three." This is the only interpretation that makes sense, given that there were only three total wounds and the pathologist also said that he could not say which of the three wounds had caused the death.

cause of death and also that the evidence must demonstrate "that the victim's death was not caused by a source unconnected to defendant's act." *Id.* at 530 (citing *People v. Lara*, 289 Ill. App. 3d 675, 680 (1997)). There was no evidence that the victim would have survived the beating without the defendant's participation, yet the court still held the evidence sufficient to convict the defendant of first degree murder as a principal.[6] *Id.* at 530-31.

¶ 36                                   2. The *Burrage* Holding

¶ 37      There is no question that, under this court's long-standing "contributing cause" theory of causation, strict "but-for" causation is not always required. The question therefore becomes whether there is any reason why the Supreme Court's decision in *Burrage* requires this court to abandon its long-standing definition of causation in homicide cases. In that case, the defendant, Marcus Burrage, sold heroin to Joshua Banka, a longtime drug user. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 885. Banka immediately began cooking and injecting the heroin. Earlier in the day, Banka had crushed, cooked, and injected oxycodone. The morning after Banka had purchased the heroin from Burrage, he was found dead in his bathroom. The medical evidence showed that Banka had in his system heroin metabolites, codeine, alprazolam, clonazepam metabolites, and oxycodone. Morphine, a heroin metabolite, was the only drug present at a level above the therapeutic range. Dr. Eugene Schwilke, a forensic toxicologist, testified that the heroin was a contributing factor in Banka's death because it interacted with the other drugs to depress Banka's respiratory and/or central nervous system. However, Schwilke could not say whether Banka would have lived had he not taken the heroin. *Id.* at ___, 134 S. Ct. at 885. Dr. Jerri McLemore, a medical examiner, testified that Banka died of " 'mixed drug intoxication.' " *Id.* at ___, 134 S. Ct. at 886. McLemore believed that heroin, alprazolam, oxycodone, and clonazepam all played a contributing role in Banka's death. *Id.* at ___, 134 S. Ct. at 886. McLemore could not say whether Banka would have lived if he had not taken the heroin but testified that it would have been " '[v]ery less likely.' " *Id.* at ___, 134 S. Ct. at 886.

¶ 38      A jury convicted the defendant of distribution of heroin with death resulting from the use of that substance. The federal Controlled Substances Act imposes a 20-year mandatory minimum sentence when a defendant unlawfully distributes a schedule I or II drug and "death or serious

---

[6]Other states have also applied a contributing cause analysis to a beating by multiple assailants. See, *e.g.*, *State v. Woods*, No. W2003-02762-CCA-R3-CD, 2005 WL 396382 (Tenn. Crim. App. Feb. 17, 2005) (Rule 19 of the Tennessee Rules of the Court of Criminal Appeals (Tenn. Crim. App. R. 19 (eff. Mar. 26, 2014)) allows citation of unpublished opinions and does not declare them to be nonprecedential); *People v. Bailey*, 549 N.W.2d 325, 334-36 (Mich. 1996). The *Woods* court explained that

"When two or more actors are involved in a homicide, both producing injuries:

'If, at the moment of death, it can be said that both injuries are contributing thereto, the responsibility rests on both actors. In such cases, the law does not measure the effects of the several injuries in order to determine which is the more serious, and which contributes in the greater measure to bring about the death. So one of two persons who cause the death of another by shooting is guilty of homicide if the wound inflicted by that person contributes to or hastens the death, although alone it might not be fatal.' " *Woods*, 2005 WL 396382, at *4 (quoting 40 Am. Jur. 2d Homicide § 14 (1999)).

bodily injury results from the use of such substance." 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012). The jury had been instructed that the government needed to prove that " 'the heroin distributed by the defendant was a contributing cause of Joshua Banka's death.' " *Burrage*, 571 U.S. at ___, 134 S. Ct. at 886 (quoting *United States v. Burrage*, 687 F.3d 1015, 1019 (8th Cir. 2012)). The district court had rejected proposed instructions from the defendant that would have (1) required the government to show proximate cause and (2) defined "proximate cause" as a cause that played a substantial part in bringing about the death, meaning that " '[t]he death must have been either a direct result of or a reasonably probable consequence of the cause and except for the cause the death would not have occurred.' " *Id.* at ___, 134 S. Ct. at 886 (quoting *Burrage*, 687 F.3d at 1020 n.3). The Court of Appeals for the Eighth Circuit affirmed. *Burrage*, 687 F.3d 1015. The court held that the contributing cause instruction was correct and that a showing of proximate cause is not required. *Id.* at 1020.

¶ 39    The Supreme Court granted certiorari on two questions:

"Whether the defendant may be convicted under the 'death results' provision (1) when the use of the controlled substance was a 'contributing cause' of the death, and (2) without separately instructing the jury that it must decide whether the victim's death by drug overdose was a foreseeable result of the defendant's drug-trafficking offense." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 886.

The Court ultimately determined that it was necessary to resolve only the first question. *Id.* at ___, 134 S. Ct. at 887. The Court found that the issue turned on the meaning of "results from" in 21 U.S.C. § 841(b)(1)(C) (2012). The Court held that the common understanding of "results from" is "but-for" causation, *i.e.*, that the harm would not have occurred but for the defendant's conduct. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 887-88. Moreover, this is the meaning that the Court gives to phrases like "results from" when there is no indication from text or context that any other meaning was intended. *Id.* at ___, 134 S. Ct. at 888. The Court further explained that, not only is "but-for" causality assumed from statutory phrases like "results from," but that in "common talk" phrases like "based on" are understood to indicate a "but-for" relationship. *Id.* at ___, 134 S. Ct. at 889. The Court explained that it was against these traditional background principles that Congress had legislated when it enacted the statute at issue.

¶ 40    The Court then rejected the government's argument that a different rule was needed for drug overdose cases because of the reality that addicts often take drugs in combination. The Court noted that one widely accepted exception to "but-for" cause is in those cases where multiple forces independently but concurrently produce a result. (For example, if someone is fatally stabbed and fatally shot at the same time, both are typically considered "causes" of the death.) *Id.* at ___, 134 S. Ct. at 889-90. However, the Court determined that it was unnecessary to decide the validity of that exception because there was no evidence in this particular case that Banka's heroin use was an independently sufficient cause of his death. *Id.* at ___, 134 S. Ct. at 890. The Court noted that another line of authority adopted in several state courts holds that something is a cause-in-fact of a result if it was a "substantial" or "contributing" factor in producing the result. *Id.* at ___, 134 S. Ct. at 890. However, the Court held that it was not free to adopt such a definition. The Court noted that Congress could have written a statute that used contributing cause language or followed the lead of several states and adopted a modified causation test for concurrent cause cases. *Id.* at ___, 134 S. Ct. at 891. Instead, Congress had used language that was understood to import "but-for" causality, and the Court held that it was

not free to ignore that choice, particularly in a criminal statute subject to the rule of lenity. *Id.* at ___, 134 S. Ct. at 891.

¶ 41 Having rejected the government's argument as a matter of statutory construction, the Court went on to discuss why it did not favor a "contributing cause" test.[7] The Court explained that courts that employ "substantial" or "contributing" factor tests varied in their application of them. *Id.* at ___, 134 S. Ct. at 891. The Court was concerned that, "[t]aken literally, [the government's] 'contributing-cause' test would treat as a cause-in-fact every act or omission that makes a positive incremental contribution, however small, to a particular result." *Id.* at ___, 134 S. Ct. at 891. The government could not specify how substantial a cause must be to qualify as substantial, and the Court was concerned that lower courts would be left to guess. The Court then stated the following:

> "One of the experts in this case, for example, testified that Banka's death would have been '[v]ery less likely' had he not used the heroin that Burrage provided. [Citation.] Is it sufficient that use of a drug made the victim's death 50 percent more likely? Fifteen percent? Five? Who knows. Uncertainty of that kind cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend. See *United States v. L. Cohen Grocery Co.*, 255 U. S. 81, 89-90 (1921)." *Id.* at ___, 134 S. Ct. at 892.

Having stated that, the Court then declared that it was a discussion for another day:

> "But in the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written—even if we think some other approach might ' "accor[d] with good policy." ' *Commissioner v. Lundy*, 516 U. S. 235, 252 (1996) (quoting *Badaracco v. Commissioner*, 464 U. S. 386, 398 (1984)). As we have discussed, it is written to require but-for cause." *Id.* at ___, 134 S. Ct. at 892.

The Court then held that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at ___, 134 S. Ct. at 892. Because the government had conceded that there was no evidence that Banka would have lived but for his use of the heroin he received from the defendant, the Court reversed his conviction. *Id.* at ___, 134 S. Ct. at 892.

¶ 42 Nothing in *Burrage* requires this court to abandon its long-standing definition of causation in homicide cases. Initially, we note that the jury instruction given in *Burrage* was not the same as the Illinois causation instruction. The instruction used in *Burrage* stated that

> " 'For you to find that a death resulted from the use of heroin, the Government must prove, beyond a reasonable doubt, that the heroin distributed by the Defendant was a contributing cause of Joshua Banka's death. A contributing cause is a factor that, although not the primary cause, played a part in the death[.]' " *Burrage*, 687 F.3d at 1019.

This instruction did not include the additional requirement imposed by IPI Criminal 4th 7.15 (Supp. 2011), that the jury must find that "the death did not result from a cause unconnected

---

[7]Justice Alito did not join this portion of the Court's opinion.

with the defendant." Much more importantly, however, *Burrage* was decided as a matter of federal statutory interpretation, and it is therefore not binding on state courts. We are free to follow it if we find it persuasive and to ignore it if we do not. We find that the *Burrage* analysis counsels *against* us abandoning the contributing cause standard. The Supreme Court in *Burrage* identified the key question as what Congress intended by the use of the phrase "results from" in 21 U.S.C. § 841(b)(1)(C), and the Court explained that Congress had chosen language that had traditionally been given a meaning of "but-for" causation by the Supreme Court. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 888-90. Similarly, the question facing *this* court is what the Illinois legislature meant when it used the word "caused" in the phrase "any person's death is caused by the injection, inhalation, absorption, or ingestion of any amount of that controlled substance." See 720 ILCS 5/9-3.3(a) (West 2012). Just as Congress was legislating against a backdrop of cases defining "results from" as meaning "but-for" causation, the Illinois legislature was legislating against a backdrop of causation in homicide cases meaning the "contributing cause" standard set forth by this court in cases such as *Brown* and *Brackett*. Thus, we presume that when the legislature used the phrase "caused" in section 9-3.3(a) it intended the meaning that Illinois courts have consistently given to this word in homicide cases. See *People v. Smith*, 236 Ill. 2d 162, 167 (2010) ("if a term has a settled legal meaning, the courts will normally infer that the legislature intended to incorporate the established meaning"). Moreover, as the appellate court noted in *Kidd*, we have clear evidence that this was the legislature's intent. The statute previously used the phrase "results from," but the legislature amended the statute in 2006 to change that phrase to "caused by." When the amendment was up for discussion in the House, Representative Pihos explained:

> "The reason for the change is to provide clarity in the law relating to drug-induced homicide. The causation language is the same as the other homicide language in the law." 94th Ill. Gen. Assem., House Proceedings, Apr. 5, 2005, at 85 (statements of Representative Pihos).

The *Kidd* court explained that the legislative history showed that "the legislature intended to change the language so that it mirrored the language of other homicide statutes, which refer to 'acts which cause the death' of an individual, whether such act is intentional (720 ILCS 5/9-1 (West 2010) (first degree murder)), negligent (720 ILCS 5/9-2 (West 2010) (second degree murder)), or reckless (720 ILCS 5/9-3 (West 2010) (involuntary manslaughter and reckless homicide))." *Kidd*, 2013 IL App (2d) 120088, ¶ 31. Thus, it is clear that "caused by" in the drug-induced homicide statute was intended to have the same meaning that "cause" has always had in Illinois homicide cases, and the Illinois courts have consistently used a "contributing cause" standard. The trial court thus did not err in using IPI Criminal 4th No. 7.15 (Supp. 2011), which correctly sets forth the causation test used in Illinois.

¶ 43                                   3. The *Burrage Dictum*

¶ 44    The Supreme Court in *Burrage*, however, included two paragraphs in which it mused on what it considered to be problems with a contributing cause approach. The Court was concerned that the contributing cause approach would treat as a cause-in-fact any act or omission that made a "positive incremental contribution, however small, to a particular result." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. Although the government argued that such a test has always been understood to exclude the causes that are insubstantial, the Court was

- 15 -

concerned that what is "substantial" could not be quantified and that lower courts would be left to guess. *Id.* at ___, 134 S. Ct. at 892. The Court did not believe that such "uncertainty" could be squared with the proof beyond a reasonable doubt standard or the need to "express criminal laws in terms ordinary persons can comprehend." *Id.* at ___, 134 S. Ct. at 892. The appellate court found this part of *Burrage* compelling, specifically stating that it saw "no answer" to it and that using a contributing cause instruction raises "grave due-process concerns." 2017 IL App (2d) 141143, ¶ 78.

¶ 45 Defendant denies that this part of *Burrage* was *dictum*. Defendant contends that this discussion was an alternative ground for the Court's decision that is binding precedent on state courts. Alternatively, defendant contends that this portion of the Court's position is, at worst, judicial *dictum*, which is entitled to much weight and should be followed unless erroneous. See *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010) (distinguishing judicial *dictum* from *obiter dictum*). Contrary to defendant's assertion, this portion of *Burrage* is unquestionably *dictum*. The Supreme Court itself said that this discussion was "beside the point" and that its job was to apply the statute as written. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 892. We think it obvious that the Supreme Court did not intend this two-paragraph discussion that it dismissed as "beside the point" to invalidate the contributing cause standard in every jurisdiction in the United States. This is particularly so, given that the Court had earlier implied that it would have respected Congress's choice to enact a statute using "contributing cause" language. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891.

¶ 46 After careful consideration, we have chosen not to abandon our contributing cause standard based on the *Burrage dictum*. We disagree with the Supreme Court and the appellate court below that the contributing cause standard raises due process concerns. The Supreme Court merely raised this point as an assertion and failed to develop it. If we drill down on what the Supreme Court said, it is difficult to understand the Court's position. For instance, the Supreme Court stated that the contribution test's uncertainty would violate the need to "express criminal laws in terms that ordinary persons can comprehend." *Id.* at ___, 134 S. Ct. at 892. The Court cited *L. Cohen Grocery Co.*, 255 U.S. at 89-90, in support. The Supreme Court has explained the reason for such a rule as follows: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939). In *Cohen*, the Supreme Court considered whether section 4 of the Lever Act was unconstitutionally vague. That statute provided, in relevant part:

> " 'That it is hereby made unlawful for any person willfully . . . to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries; to conspire, combine, agree, or arrange with any other person . . . (e) to exact excessive prices for any necessaries. . . . Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000 or be imprisoned for not more than two years, or both: . . .' " *L. Cohen Grocery Co.*, 255 U.S. at 86 (quoting Food Control and the District of Columbia Rents Act, Pub. L. No. 66-63, ch. 80, tit. 1, § 2, 41 Stat. 297 (1919)).

The Court held that the statute was not "adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them," because it "forbids no specific or definite act." *Id.* at 89. Thus the statute left open "the widest conceivable inquiry, the scope

of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *Id.*

¶ 47    It is difficult to see how these concerns are implicated by using a contributing cause standard with either 21 U.S.C. § 841(a)(1), (b)(1)(A)-(C) (2012) or the Illinois drug-induced homicide statute. Both the federal and the Illinois statute state in no uncertain terms what conduct is forbidden: the unlawful delivery of controlled substances. Both statutes subject defendants to a greater penalty if a person dies from using the controlled substances they deliver. The Illinois statute accomplishes this by making the delivery a homicide, the federal statute by subjecting the defendant to a sentencing enhancement. But the only statutory element that a defendant has any control over is the delivery of the controlled substance. Both statutes are crystal clear as to what conduct is forbidden, and persons of ordinary intelligence do not have to guess at what conduct is proscribed. The concerns expressed in *L. Cohen Grocery* are simply not present here.

¶ 48    Similarly, we fail to see how using a contributing cause standard would implicate the proof beyond a reasonable doubt requirement. Possibly, if the statute is interpreted to require "but-for" causation and the jury is instructed with a "contributing cause" instruction (as was the case in *Burrage*), then that concern might be valid. In that case, the jury might be misled into returning a guilty verdict in a case in which the prosecution had not established "but-for" causation. If the statute is understood as requiring *contributing* causation, however, and that is how the jury is instructed, then it is difficult to see how the proof beyond a reasonable doubt standard is implicated. See, *e.g.*, *People v. Brown*, 57 Ill. App. 3d 528, 531 (1978) (State's burden is to show that "the defendant's act was, beyond a reasonable doubt, a contributing cause to a death"). And, again, the Supreme Court stated in *Burrage* that Congress could have written section 841(b)(1)(C) using contributing cause language. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. We have already set forth above why it is clear that the Illinois legislature intended the drug-induced homicide to require contributing cause, and therefore using IPI Criminal 4th 7.15 (Supp. 2011) in no way erodes the proof beyond a reasonable doubt standard.

¶ 49    The Supreme Court was also concerned that the contributing cause standard would treat as a cause-in-fact "every act or omission that makes a positive incremental contribution, however small, to a particular result." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. But as the Supreme Court itself acknowledged, courts deal with this problem by excluding insubstantial causes. Moreover, the same criticism could be made of the "but-for" test, as the Supreme Court itself acknowledged earlier in the opinion. The Court explained that, even if other forces are combining to produce a particular result, something that contributes incrementally to the outcome is a cause-in-fact if it was the "straw that broke the camel's back." *Id.* at ___, 134 S. Ct. at 888. Thus, under the "but-for" test, a cause may be minor, but if the outcome would not have happened without it, it qualifies as a cause-in-fact. Some contributing cause jurisdictions deal with this problem by invoking a "substantial factor" requirement,[8] and the government argued that its proposed test would exclude causes that are " 'too insubstantial' " or " 'not

---

[8]Illinois has not heretofore imposed a "substantial factor" requirement, but it does have the additional requirement that the State must establish that the death "did not result from a cause unconnected with the defendant." IPI Criminal 4th No. 7.15 (Supp. 2011).

important enough.' " *Id.* at ___, 134 S. Ct. at 891-92.[9] But the Court was concerned with the government's inability to quantify what is too insubstantial and the fact that "[p]resumably the lower courts would be left to guess." *Id.* at ___, 134 S. Ct. at 892.

¶ 50　　Professor Eric A. Johnson of the University of Illinois College of Law has responded to this point well:

"[I]t just isn't true that terms like 'substantial' and 'important' make statutes unconstitutionally vague. Criminal statutes routinely use terms like 'substantial' and 'important,' and really couldn't do otherwise. Indeed, Justice Scalia acknowledged as much in his 2015 opinion for the Court in *Johnson v. United States*[, ___ U.S. ___, 135 S. Ct. 2551 (2015)]. In *Johnson*, the Court struck down as unconstitutionally vague the residual clause of the Armed Career Criminal Act, under which a defendant's prior felonies would trigger enhanced sentencing if they involved 'serious potential risk.' What made the statute vague, said Justice Scalia, was not its use of the phrase 'serious potential risk.' What made the statute vague was that it required the courts to apply this standard to 'an idealized ordinary case of the [charged] crime.' Justice Scalia acknowledged that 'dozens of federal and state criminal laws use terms like "substantial risk," "grave risk," and "unreasonable risk" ' and that the use of phrases like these are not constitutionally suspect: 'As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as "substantial risk" to real-world conduct; "the law is full of instances where a man's fate depends on his estimating rightly ... some matter of degree." ' The traditional exclusion of 'insignificant or merely theoretical' contributions from the contribution rule's scope is not really constitutionally suspect, then." Eric A. Johnson, *Cause-in-Fact After Burrage v. United States*, 68 Fla. L. Rev. 1727, 1770 (2016).

¶ 51　　The Supreme Court was also concerned that application of the contributing cause test varies from jurisdiction to jurisdiction. Some jurisdictions require the defendant's act to be sufficient to produce the result by itself, while others do not. See *Burrage*, 571 U.S. at ___, 134 S. Ct. at 891. The appellate court below had the same concern, referring to the contributing cause test as having a "severe identity crisis." 2017 IL App (2d) 141143, ¶ 98. Once again, the exact same thing could be said about the "but-for" test. As Professor Johnson has noted, "[t]hough a few state courts appear to require but-for causation exclusively, many more state courts have recognized one or both of two broad exceptions to the but-for test." Johnson, *supra*, at 1729-30. Indeed, the difficulty of adopting the "but-for" test as a necessary requirement of cause-in-fact can be seen just within the confines of the appellate court's opinion. The appellate court quoted approvingly the Missouri Supreme Court's statement in *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 862 (Mo. 1993) (*en banc*), that "but for" is an "absolute minimum" for causation because it is equivalent to causation in fact. 2017

---

[9]Professor LaFave has argued that the "substantial factor" test is the most accurate way to describe the cause-in-fact requirement:

"So the test for causation-in-fact is more accurately worded, not in terms of but-for cause, but rather: Was the defendant's conduct a substantial factor in bringing about the forbidden result? Of course, if the result would not have occurred but for his conduct, his conduct is a substantial factor in bringing about the result; but his conduct will sometimes be a substantial factor even thought not a but-for cause." LaFave, *supra*, § 6.4(b), at 634.

- 18 -

IL App (2d) 141143, ¶ 105. But the appellate court then recognized and approved two exceptions to the rule of "but-for" causation: situations in which a defendant's act and a concurrent cause are independently sufficient to cause the result and situations in which a defendant's act merely hastens the victim's death. *Id.* ¶¶ 62, 74, 103 n.2. Once one acknowledges that there are situations in which the "but-for" rule does not apply and in which cause-in-fact can be established without it, it no longer makes sense to refer to "but for" as an "absolute minimum" requirement of causation or the equivalent of cause-in-fact. That application of the "but-for" test and the "contributing cause" test varies from jurisdiction to jurisdiction does not indicate a fatal flaw with either approach. It merely demonstrates the difficulty that courts face in trying to adopt a generally applicable rule for cause-in-fact.

¶ 52    For all of the above reasons, we disagree with the Supreme Court that a contributing cause standard raises due process or other concerns, and we choose not to follow the *Burrage dictum*.

¶ 53                    4. The Superiority of a Contributing Cause Approach

¶ 54    Not only does nothing in *Burrage* require us to abandon our contributing cause standard, there are compelling reasons for a court to use a contributing cause approach to cause-in-fact. In the law review article cited above, Professor Johnson criticizes *Burrage* and argues that state courts should continue to apply a contribution rule. We discuss this article at some length because it details thoroughly the problems with *Burrage* and convinces us that our contributing cause standard is the correct one. The principal flaw in *Burrage* is that the Court treated causation as a simple issue. Johnson, *supra*, at 1771 ("Causation is complicated. You wouldn't know it from the Supreme Court's opinion in *Burrage*, though."). Professor Johnson explains that the Court's assertion that the "but-for" test captures what ordinary people mean when they say that something is a "cause" of another's harm is "demonstrably false" (*id.*) and that the Court's opinion "fails on its own terms—as an analysis of the 'ordinary meaning' of terms like 'causes' and 'results from' " (*id.* at 1731).

¶ 55    As aptly noted by Professor Johnson, the "but-for" test is useful when considered as a test to identify a cause as *sufficient* to impose criminal liability, but the more difficult question is whether the but-for test is *necessary* to trigger criminal liability. *Id.* at 1738-39. Professor Johnson argues that it should not be considered necessary, because it fails to capture ordinary usage in two important classes of cases: (1) those cases in which a defendant's act cuts off or preempts another causal process that would have caused the same harm ("spurious-sufficiency" cases) and (2) cases in which the defendant's act plays a role in the causal mechanism underlying the harm but is potentially superfluous ("causal-overdetermination" cases). *Id.* at 1739, 1743.

¶ 56    An example of a "spurious-sufficiency" case would be *A* giving *B* a deadly dose of poison but *C* shooting *B* before the poison takes effect. Professor Johnson explains that, in this case, *C* is the cause-in-fact of *B*'s death. *Id.* at 1739. The "independently sufficient" test identified by the Supreme Court in *Burrage* does not work here, because it would identify both *A* and *C* as causes of *B*'s death, when in fact only *C* was the cause-in-fact of *B*'s death. *Id.* at 1740. Meanwhile, the "but-for" test would say that *neither A* nor *C* was the cause of *B*'s death. *Id.*

¶ 57    An example of a causal overdetermination case would be one in which two people simultaneously fatally shoot a third person. Another example would be a case in which three people engage in the same conduct toward the victim and the contribution of any two of them

would have been sufficient to cause the harm. In these types of cases, the "but-for" test would say that the harm has no cause at all. *Id.* at 1743-46. The term "causal overdetermination" comes from the Supreme Court's opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989), in which the Court stated:

> "Suppose two physical forces act upon and move an object, and suppose that either force acting alone would have moved the object. As the dissent would have it, *neither* physical force was a 'cause' of the motion unless we can show that but for one or both of them, the object would not have moved; apparently both forces were simply 'in the air' unless we can identify at least one of them as a but-for cause of the object's movement. *Ibid*. Events that are causally overdetermined, in other words, may not have any 'cause' at all. This cannot be so." (Emphasis in original.)

In its brief in *Burrage*, the government adapted this hypothetical to the criminal law context by using the example of three people each putting one drop of poison in a person's drink. Two drops of poison are sufficient to kill the person. Both the "but-for" test and the "independently sufficient" test would say that none of the three had caused the victim's death, while common sense and ordinary understanding would say that all three had caused the death.

¶ 58    Professor Johnson explains that state courts have come up with two rules to address spurious sufficiency and causal overdetermination cases: the acceleration rule and the contribution rule. Johnson, *supra*, at 1771. Each of the rules addresses both problems, but in different contexts. *Id.* The acceleration rule holds that a person is still liable for another's death even if he merely hastens the death of somebody who was already dying. This court recognized the acceleration rule long ago. In *Cunningham*, 195 Ill. at 572, this court stated that, "[i]t is immaterial, in respect of criminal responsibility, that the injuries but hastened the death of the person assaulted, for, as expressed by ancient writers and judges, 'the offender may not apportion his own wrong' " (quoting 9 Am. & Eng. Encyclopedia of L. 534-35 (1889)).

¶ 59    The other way in which state courts address spurious insufficiency and causal overdetermination cases is through the contribution rule. Professor Johnson points out that the contribution rule is at least as well established as the "but-for" rule:

> "The rule appears to have been well-established even in the nineteenth century. Joel Prentiss Bishop, whose 1858 *Commentaries on the Criminal Law* was as influential in Bishop's day as LaFave's treatise is in ours, formulated the basic causation requirement in the law of homicide as a 'contribution' requirement: 'The general rule, both of law and of reason, is, that whenever a man contributes to a particular result he is holden for the result, the same as if his sole [act] produced it.' Bishop wasn't just being careless in his choice of words, moreover. He wasn't just using 'contribution' as shorthand for but-for causation. Under the contribution rule, said Bishop, it doesn't matter whether the victim 'would have died from other causes, or would not have died from this one, had not others operated with it.' What matters, rather, is whether the defendant's conduct 'really contributed mediately or immediately to the death, *as it actually took place*, in a degree sufficient for the law's notice.' " (Emphasis added.) Johnson, *supra*, at 1759 (quoting 2 Joel Prentiss Bishop, Commentaries on the Criminal Law § 653 (2d ed. 1859)).

In another criminal law treatise, the authors explain:

"If a man bleeds to death from two wounds inflicted by different persons, acting quite independently, 'both may properly be said to have contributed to his death.' If at the moment of death both injuries were substantially contributing thereto, the 'law does not measure the effects of the several injuries in order to determine which is the more serious and which contributed in greater measure to bring about the death,' but imputes the loss of life to both. But suppose one wound severed the jugular vein whereas the other barely broke the skin on the hand, and as the life blood gushed from the victim's neck, one drop oozed from the bruise on his finger ***. [T]he law will apply the substantial factor test and for juridical purposes the death will be imputed only to the severe injury in such an extreme case as this." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 779 (3d ed. 1982).

The authors further explain:

"If a certain act was a substantial factor in bringing about the loss of human life, it is not prevented from being a proximate cause of this result by proof of the fact that it alone would not have resulted in death, nor by proof that another contributory cause would have been fatal even without the aid of this act." *Id.* at 783.

The appellate court stated that the proposition that but-for causation is required to convict a defendant of homicide is "widely accepted by both courts of review and scholars." 2017 IL App (2d) 141143, ¶ 106. It is equally clear, however, that the proposition that causation may be established by showing that an act of defendant hastened or contributed to a victim's death is also widely accepted by courts of review and legal scholars.

¶ 60    Relevant for our purposes here is how the contribution rule addresses cases of causal overdetermination. Professor Johnson uses this court's decision in *Brown* as an example. In that case, which we have already discussed, the victim died after being shot by two different people with two different weapons, and the pathologist was unable to say which of the wounds caused the victim's death or whether each of the wounds had accelerated the victim's death. Professor Johnson writes that "[w]hat the Illinois Supreme Court said in *Brown*, and what state courts have said consistently in cases like *Brown* is that contribution is enough: '[T]he defendant's act need only contribute to the victim's death to prove the defendant guilty of murder.' " Johnson, *supra*, at 1766 (quoting *Brown*, 169 Ill. 2d at 153). Although this court has not attempted to define the word "contribute" in this situation, Professor Johnson notes that the California Supreme Court has formulated a definition that explains cases such as *Brown*. In *People v. Jennings*, 237 P.3d 474, 496 (Cal. 2010), the court explained that a defendant contributes concurrently to a death if his conduct was "operative at the moment of the death and acted with another cause to produce the death" (internal quotation marks omitted). Professor Johnson explains:

"This definition nicely captures what courts mean by 'contribute' in this setting. If the forces set in motion by the defendant are not 'operative in the moment of the result'—if they are cut off or 'preempted' at the last moment, say, or if the various conditions on which the conduct's causal efficacy depends are not present—then the defendant's conduct doesn't really 'contribute' to the result. Nor does the defendant's conduct 'contribute' in the required sense unless it 'acts with another cause'—unless it complements the other events and conditions that, together with the defendant's conduct, overdetermine the result. This twofold definition was satisfied in the *Brown*

case, for example, where the blood loss from each of the victim's wounds complemented the blood loss from the others, and where 'at the very instant of death [each] wound was contributing to the event.' " Johnson, *supra*, at 1767 (quoting *People v. Lewis*, 57 P. 470, 473 (Cal. 1899)).

A similar explanation was cited by the *Woods* court when it stated that, " '[i]f, at the moment of death, it can be said that both injuries are contributing thereto, the responsibility rests on both actors.' " *Woods*, 2005 WL 396382, at *4 (quoting 40 Am. Jur. 2d Homicide § 14 (1999)).

¶ 61    However, Professor Johnson clarified that "lawyerly elaboration of the word 'contribute' probably isn't necessary in the usual case. The requirement that the defendant's conduct complement another causal factor is implicit in the word 'contribute.' " Johnson, *supra*, at 1768. Moreover, problems can arise from trying to define what constitutes a concurrent cause. For instance, Arkansas defines causation by statute as follows:

> "Causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless:
>
>> (1) the concurrent cause was clearly sufficient to produce the result; and
>>
>> (2) the conduct of the defendant was clearly insufficient to produce the result." Ark. Code Ann. § 5-2-205 (2006).

Under this definition, Marcus Burrage's conviction might well have been upheld. Yet it would, like the "but-for" test, yield the wrong answer in the three drops of poison hypothetical. In that hypothetical, the other causes were clearly sufficient and the defendant's act clearly insufficient, but it seems absurd to say that the defendant was not a cause of the victim's death.

¶ 62    In the Bishop treatise cited earlier it was stated that what matters is whether the defendant's conduct "really contributed mediately or immediately to the death, *as it actually took place*, in a degree sufficient for the law's notice." (Emphasis added). Bishop, *supra*, § 653. This framing of the inquiry makes sense of the three drops of poison hypothetical. Whether the victim would have died from drinking *two* drops of poison in another reality is beside the point. What happened in *this* reality is that the victim died from drinking *three* drops of poison, and the defendant supplied one of those drops. Similarly, this framing of the question would say that in the *Burrage* case we should not concern ourselves with whether, in an alternative reality, the oxycodone, alprazolam, and clonazepam that Joshua Banka took would have suppressed his central nervous system to the point where he died. In *this* reality, the heroin that Marcus Burrage sold to Joshua Banka combined with the other three drugs to suppress his respiratory and/or central nervous system until he died. The medical examiners believed that all of the drugs played a contributing role, and as the Supreme Court itself described the testimony, "[t]he heroin, in other words, contributed to an overall effect that caused Banka to stop breathing." *Burrage*, 571 U.S. at ___, 134 S. Ct. at 885-86. Dr. Schwilke testified that the heroin interacted with other drugs to depress Banka's respiratory and/or central nervous systems, and Dr. McLemore testified that the heroin played a contributing role in Banka's death. In the words of the Bishop treatise, the heroin "really contributed mediately or immediately to the death, as it actually took place, in a degree sufficient for the law's notice." Bishop, *supra*, § 653. The Supreme Court was concerned with the medical experts' inability to say what the chances were of Banka dying without the heroin and by what percentage the heroin increased the chance of death. But that concern seems misplaced, given that both of the

medical experts were certain that the heroin played a role in Banka's death *as it actually happened*. *Burrage*, 571 U.S. at ___, 134 S. Ct. at 885-86.

¶ 63    For all of these reasons, we believe that a "contributing cause" standard better captures the ordinary meaning of "cause" than a strict "but-for" standard. Although establishing "but-for" cause is *sufficient* to establish cause-in-fact and will be established in the majority of cases, we do not believe that "but-for" cause is always *necessary* to establish cause-in-fact. A contributing cause standard better comports with the ordinary understanding of the word "cause" in cases of multiple causation. It is important to clarify what a contributing cause standard does *not* do. The appellate court quoted approvingly from *Callahan*, 863 S.W.2d at 862, wherein the Missouri Supreme Court stated the following:

> " 'But for' is an absolute minimum for causation because it is merely causation in fact. Any attempt to find liability absent actual causation is an attempt to connect the defendant with an injury or event that the defendant had nothing to do with. Mere logic and common sense dictates that there be some causal relationship between the defendant's conduct and the injury or event for which damages are sought."

There is much wrong with this. First, as we have already demonstrated, it is not accurate to describe "but-for" causation as the "absolute minimum" that must be proved to establish causation. There is almost universal acknowledgement that there are situations where cause-in-fact can be established without establishing "but-for" causation. Second, "but-for" causation is *not* the same thing as causation in fact. It is the easiest way to establish it, but it is not the only way. Third, while it may be true that an "attempt to find liability absent actual causation is an attempt to connect the defendant with an injury or event that the defendant had nothing to do with," it is *not* true that this is what happens with a contributing cause rule. Again, remember what the Illinois causation instruction provides:

> "In order for you to find that the acts of the defendant caused the death of _____, the State must prove beyond a reasonable doubt that defendant's acts were a contributing cause of the death and that the death did not result from a cause unconnected with the defendant. However, it is not necessary that you find the acts of the defendant were the sole and immediate cause of death." IPI Criminal 4th No. 7.15 (Supp. 2011).

It is difficult to see how this instruction creates a danger of a defendant being convicted of an offense that he or she *had nothing to do with*. Or consider the situations we have discussed earlier in this opinion, *i.e.*, several persons putting poison in a person's drink, two different people wounding the defendant with gunshots, multiple people beating a person to death, or someone providing a controlled substance that combines with other substances to cause a person's death. All of these situations, in which "but-for" causation often cannot be established but contributing causation can, are not attempts to connect the defendant with an injury that he or she "had nothing to do with." Moreover, these are not, in the words of the appellate court, situations in which the defendant "might have caused the victim's death." (Emphasis omitted.) 2017 IL App (2d) 141143, ¶ 78.[10] Rather, they are situations in which the defendant's act contributed to the victim's death as it actually happened.

_____

[10]In disapproving of theories of causation where the defendant "might have caused the victim's death," the appellate court failed to address its earlier opinion in *People v. Hoerer*, 375 Ill. App. 3d 148,

¶ 64   This court has defined criminal causation in terms of a contributing cause standard for over a century. Nothing in *Burrage* requires us to abandon that standard, and nothing in *Burrage* convinces us that we should abandon that standard. We appreciate the appellate court's concerns and in-depth analysis of this issue, but we disagree with its conclusion that we should replace the contributing cause standard with a "but-for" requirement. We agree with the appellate court, however, that the trial court did not err in using IPI Criminal 4th No. 7.15 (Supp. 2011). That instruction properly sets forth causation principles as determined by this court, and therefore, Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) required the trial court to use it.

¶ 65                                    B. *Acts of Defendant*

¶ 66   Defendant raises a second issue with respect to the trial court's use of IPI Criminal 4th No. 7.15 (Supp. 2011). The instruction refers to "defendant's acts," the "acts of defendant," and "a cause unconnected with defendant." In a drug-induced homicide case, the only "act" that is relevant is the defendant's knowing delivery of a controlled substance. Defendant argued at the instructions conference that, in a case in which the defendant delivered more than one controlled substance, the instruction will be misleading and could cause the jury to consider matters that it should not be considering. Thus, defendant asked the trial court to modify the instruction to refer specifically to defendant's act of delivering heroin, to ensure that the jurors did not improperly consider defendant's delivery of cocaine. Defendant's proposed instruction read:

> "In order for you to find that the acts of the defendant caused the death of Augustina Taylor, the State must prove beyond a reasonable doubt that defendant's act of delivering heroin and Augustina Taylor injecting that heroin was the proximate cause of her death and that her death did not result from a cause unconnected with Augustina Taylor's injection of the heroin defendant delivered. However, it is not necessary that you find the act of delivering heroin was the sole and immediate cause of death."

The trial court denied the modification on the basis that *Kidd* held that IPI Criminal 4th No. 7.15 (Supp. 2011) correctly set forth the causation rule in drug-induced homicide cases.

¶ 67   We agree with the appellate court that the instruction should be modified in limited circumstances such as these where the defendant delivered multiple controlled substances to the victim but is charged with drug-induced homicide on the basis of only one of the deliveries.[11] *Kidd* did not speak to this issue because the defendant in that case delivered only one controlled substance to the victim. That said, we decline to find reversible error. As this court has explained:

> "We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles. *People v. Terry*, 99 Ill. 2d 508, 516 (1984) ('Instructions in criminal cases must be read as a whole. "It is

---

149-50, 156-57 (2007), where it held that the evidence was sufficient for a manslaughter conviction when, but for the defendant's efforts in preventing his friends from summoning assistance for a victim who had overdosed, the victim "might have survived."

[11]Defendant's proposed instruction was not entirely correct. It used the proximate cause language that the appellate court had rejected in *Kidd*.

sufficient if the series of instructions, considered as a whole, fully and fairly announce the law applicable to the respective theories of the People and the defense" '), quoting *People v. Kolep*, 29 Ill. 2d 116, 125 (1963). Jury instructions are intended to guide the jury in its deliberations and to assist the jury in reaching a proper verdict through application of legal principles to the evidence and law. *People v. Hester*, 131 Ill. 2d 91, 98 (1989). Jury instructions should be construed as a whole, rather than read in isolation. *People v. Ward*, 187 Ill. 2d 249, 265 (1999)." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

When read as a whole, the jury instructions clearly conveyed to the jury that defendant was charged only with delivering heroin to Taylor and that, to convict defendant, the jury had to find beyond a reasonable doubt that defendant delivered heroin to another person and that Taylor's death was caused by the injection, inhalation, or ingestion of the heroin that defendant delivered. Thus, we agree with the appellate court that any error in failing to modify the instruction was harmless.

¶ 68                        II. Sufficiency of the Evidence

¶ 69    Finally, defendant contends that the evidence was insufficient to establish her guilt beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence, our function is not to retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Rather, this court considers whether, viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 70    Defendant's sufficiency argument consists of two points raised in little more than summary fashion. First, she contends that the evidence showed that Taylor had used heroin the day before and had some left over on the day she died. Thus, no rational trier of fact could have concluded that it was the heroin that defendant sold to her that had caused her death. Second, because Dr. Harkey testified that cocaine alone could have caused her death, no rational trier of fact could have concluded beyond a reasonable doubt that the heroin defendant sold her caused her death. Defendant's reasonable doubt argument turns the standard of review on its head and asks this court to consider the evidence in the light most favorable to defendant.

¶ 71    The State was required to prove beyond a reasonable doubt that defendant sold heroin to Taylor and that the heroin was a contributing cause of Taylor's death. Dr. Harkey testified that Taylor died from cocaine and heroin intoxication. Defendant does not contest that the evidence established that she delivered heroin to Taylor on the day Taylor died. The evidence was conflicting over whether Taylor had used heroin the day before. The evidence that Taylor used heroin the day before came from Walker's testimony, and Walker was impeached with her own inconsistent statements. Moreover, members of Taylor's family testified that she was acting normally both on the evening that she was released from prison and on the day of the party before defendant arrived. In any event, Harkey testified that the presence of 6-MAM in Taylor's blood established recent use of heroin. The sequence of events also supported an inference that it was the heroin that defendant delivered to Taylor that combined with cocaine to cause her death. Immediately after receiving the heroin from Taylor, defendant locked herself in the bathroom and was found unresponsive shortly thereafter. Moreover, as the

- 25 -

appellate court noted, even if Taylor had used heroin the previous day and might have had some left over on the day she died, the jury could have reasonably inferred that Taylor's request for heroin from defendant meant that she was out of heroin at the time, and the jury "did not need to believe that [Taylor] agreed to buy heroin that she did not need." 2017 IL App (2d) 141143, ¶ 126.

¶ 72　As for evidence that cocaine alone could have caused Taylor's death, we note that this is not what Dr. Harkey opined was the cause of death. Dr. Harkey concluded that Taylor died of heroin and cocaine intoxication. When asked about the possibility of cocaine alone causing a death, he was asked about this only in a general sense. Dr. Harkey acknowledged that cocaine can cause cardiac arrhythmia, which can lead to fatal heart failure. Defendant did not pursue this line of questioning any further and ask whether there was any evidence that *Taylor* died this way. Dr. Harkey's testimony on this point established nothing more than the fact that cocaine can cause death. It in no way cast doubt on his opinion that heroin and cocaine combined to cause Taylor's death. Moreover, the evidence with respect to cocaine use showed that Taylor had either used a large amount of cocaine at an earlier time or a smaller amount close to the time of death. By contrast, the evidence showed that the amount of morphine in Taylor's blood was "way beyond" what someone would take medicinally and was at an amount associated with heroin fatalities. Thus, there was nothing about the evidence of Taylor's cocaine use that undermined Harkey's opinion that Taylor died of heroin and cocaine intoxication. The evidence was sufficient to establish beyond a reasonable doubt that the heroin defendant delivered to Taylor was a contributing cause of Taylor's death.

¶ 73　　　　　　　　　　　　　　　　CONCLUSION

¶ 74　For the above reasons, we affirm the judgment of the appellate court, although we do not agree entirely with the appellate court's reasoning. We hold that, as a matter of state law, IPI Criminal 4th 7.15 (Supp. 2011) properly sets forth the principles of causation established by this court and therefore the trial court did not err in using it. We reject the appellate court's conclusion that use of this instruction raises "grave due process concerns," and we are not convinced by the Supreme Court's *dictum* in *Burrage* that we should abandon the "contributing cause" standard. We agree with the appellate court that the instruction should be modified in cases of drug-induced homicide where the defendant delivers multiple controlled substances to the victim but is charged based on only one of the deliveries. However, we hold that the trial court's failure to do so in this case was harmless error. Finally, we hold that the evidence was sufficient to convict defendant beyond a reasonable doubt of drug-induced homicide.

¶ 75　Affirmed.